E. Ted Taylor ("Taylor") appeals from a summary judgment in favor of Larry D. Striplin ("Striplin"), holding as a matter of law that Striplin was entitled to the proceeds of a certificate of deposit interpleaded by The Bank, a state-chartered bank in Birmingham (hereinafter referred to as "The Bank").[1] We affirm.
 Undisputed Facts
Regional Sports Network, LLC ("RSN"), is a limited liability company formed in 1998. Pursuant to two promissory notes, one dated September 4, 1998, and the other dated October 14, 1998, The Bank loaned RSN a total of $3.5 million (hereinafter referred to as "the RSN loans"). The RSN loans were guaranteed by multiple shareholders of RSN, one of whom was Taylor.[2]
Taylor, through unlimited *Page 300 
personal guaranties, guaranteed the entire indebtedness of the RSN loans. Additional collateral pledged as security for the RSN loans included a Kentucky horse farm owned by Taylor, as to which The Bank held a mortgage; real property owned by Taylor in Greene County, Alabama; investment accounts owned by Kirk Wood, Jr.; real property owned by Kirk Wood, Jr.; and the assets of RSN. In September 2000, Taylor sold the Kentucky horse farm and placed $2.7 million of the proceeds into a money-market account at The Bank; those proceeds were also pledged as collateral for the RSN loans.
On October 25, 2000, Striplin, a director and a shareholder of The Bank, executed a "Pledge and Assignment of Certificate of Deposit and Account" (hereinafter referred to as "the Striplin pledge agreement"), pledging as additional security for the RSN loans a certificate of deposit (no. 31369) in the amount of $1 million.[3] Striplin at the time was interested in investing in RSN. Jimmy Taylor, Sr., who was the chairman and chief executive officer of The Bank and Taylor's brother, suggested to Striplin that, as an alternative to becoming an investor in RSN, he pledge a certificate of deposit as additional collateral for the RSN loans. Jimmy Taylor, Sr., knew that bank examiners had expressed concern to The Bank about the RSN loans because of the amount of money RSN appeared to be losing. The Striplin pledge agreement helped The Bank achieve an upgraded "pass rating" on the RSN loans. At the time Striplin pledged the certificate of deposit, he had no interest in RSN. Further, the Striplin pledge agreement was executed over two years after The Bank had loaned RSN a total of $3.5 million, and over two years after the RSN loans had been guaranteed by other guarantors.
The Striplin pledge agreement contained certain conditions that had to occur before The Bank could charge against the certificate of deposit in the event of a default of the RSN loans. The operative language of the Striplin pledge agreement states:
 "Upon the failure of [RSN] to pay any Obligations according to its terms, or upon a default in the Obligations as defined in the agreements as evidencing such Obligations, and upon the expiration of one hundred and eighty (180) days following the foreclosure of all of the real estate pledged as collateral for [RSN's] obligations to [The Bank] (or if none, then upon the expiration of one year from the date of the default), then the liability of the undersigned hereunder to [The Bank] shall become immediately due and payable, . . . and [The Bank] may . . . charge against the hereinabove [certificate of deposit] any balance of [RSN's] Obligations to [The Bank], which are currently due and payable in accordance with the agreements evidencing such Obligations."
(Emphasis added.)
On August 22, 2001, Taylor learned that Striplin had pledged the certificate of deposit as security for the RSN loans. On August 31, 2001, following several extensions of payment deadlines by The Bank, *Page 301 
RSN defaulted on the RSN loans. Several limited guarantors made payments to The Bank under the terms of their obligations. On September 28, 2001, Taylor, as an unlimited guarantor of the RSN loans, tendered to The Bank $2,685,309.14, which represented the remaining amount of principal and interest due on the RSN loans. The Bank did not at any time following the default of the RSN loans attempt to collect against any of the collateral pledged for the loans. Thereafter, The Bank executed in Taylor's favor a written assignment of numerous documents, including all guaranties, pledge agreements, and mortgages, that it had received in regard to RSN's debt; among these documents was the Striplin pledge agreement.
Striplin and Taylor each claimed ownership of the certificate of deposit; The Bank filed an interpleader action against them and deposited the certificate of deposit with the clerk of the court. Both Striplin and Taylor filed motions for a summary judgment, each claiming ownership of the certificate of deposit. Following a hearing, the trial court concluded as a matter of law that Striplin was entitled to a summary judgment. Specifically, the trial court determined that the Striplin pledge was not supported by consideration and, alternatively, that Striplin's liability under the Striplin pledge agreement was extinguished once RSN's obligations to The Bank had been paid in full. The trial court certified the summary judgment as final pursuant to Rule 54, Ala.R.Civ.P. Taylor appeals.
 Standard of Review
In reviewing a summary judgment, we use the same standard the trial court used in determining whether the evidence before it presented a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Busseyv. John Deere Co., 531 So.2d 860, 862 (Ala. 1988); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that no genuine issue of material fact exists, the burden then shifts to the nonmovant to present substantial evidence creating such an issue. Bass v, SouthTrust Bank ofBaldwin County, 538 So.2d 794 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989). In reviewing a summary judgment, this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412
(Ala. 1990). Furthermore, "[i]f the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by a summary judgment." McDonaldv. U.S. Die Casting Dev. Co., 585 So.2d 853, 855
(Ala. 1991).
 Analysis and Conclusion
Taylor contends, among other things, that the trial court's holding — that Striplin's liability under the Striplin pledge agreement was extinguished once RSN's obligations to The Bank were paid in full — is in direct conflict with the clear language of § 8-3-2, Ala. Code 1975. Section 8-3-2, Ala. Code 1975, provides:
 "A surety who has paid his principal's debt is entitled to a transfer of the original and collateral security which the creditor holds; he has all the rights to realize thereon and to reimburse himself to the same extent as the creditor might have done before the surety paid him, whether paid before or after judgment; *Page 302 
and he shall be substituted for the creditor and subrogated to all his rights and remedies; in effect, he shall be a purchaser of the debt and all its incidents."
There is no question that Taylor, as surety for the RSN loans, was subrogated to all the rights and remedies of The Bank in relation to the RSN loans. However, it is clear that, under the law in Alabama regarding subrogation, Taylor, as subrogee, "can acquire no greater rights than those possessed by the principal whose rights he asserts." Home Ins. Co. v. Stuart-McCorkle,Inc., 291 Ala. 601, 607, 285 So.2d 468, 472 (1973). InCrutchfield v. Johnson Latimer, 243 Ala. 73, 75,8 So.2d 412, 414 (1942), this Court stated:
 "A person entitled to subrogation must work through the creditor whose rights he claims. He stands in the shoes of the creditor and is entitled to the benefit of all the remedies of the creditor and may use all means which the creditor could to enforce payment. But he can only enforce such rights as the creditor could enforce, and must exercise such rights under the same conditions and limitations as were binding on the creditor, and hence, can be subrogated to no greater rights than the one in whose place he is substituted."
(Emphasis added; citations omitted.)
Taylor further contends that Striplin's liability is unconditionally triggered by the passage of one year from the date of default without any foreclosures having occurred. He relies on that portion of the Striplin pledge agreement describing the event triggering Striplin's liability as follows:
 "[U]pon the expiration of one hundred and eighty (180) days following the foreclosure of all of the real estate pledged as collateral for [RSN's] obligations to [The Bank] (or if none, then upon the expiration of one year from the date of the default)."
(Emphasis added.)
According to Taylor, "none" refers to foreclosures, and there were no foreclosures. Striplin, on the other hand, contends that "none" refers to the absence of real estate pledged as collateral at the time of default. Because we conclude that, in all events, The Bank, and anyone standing in its shoes, could charge against Striplin's certificate of deposit only if RSN's indebtedness remained due and payable at the end of the one-year period following default, and it is undisputed that no indebtedness remained at that time, we need not address these conflicting contentions as to the meaning of the word "none" in the Striplin pledge agreement.
We must give the language of the Striplin pledge agreement its plain and ordinary meaning and determine the intent of the parties, if possible, from the provisions of the Striplin pledge agreement. The Striplin pledge agreement cites specific conditions that must occur before The Bank can charge against Striplin's certificate of deposit. The pledge states that The Bank can, 180 days following the foreclosure of all of the real estate pledged as collateral on the RSN loans, charge against the certificate of deposit any balance due and payable to The Bank. It is undisputed that The Bank, following default of the RSN loans, never attempted to foreclose on any of the real estate pledged as collateral for the RSN loans. Taylor's tender of the remaining balance due on the RSN loans rendered foreclosure by The Bank unnecessary. In the event there is no foreclosure of real estate pledged as collateral, the pledge states that The Bank, after the expiration of one year fromthe date of default, can charge against the certificate of deposit "any balance . . . currently due andpayable" to The Bank *Page 303 
under the RSN loans. It is undisputed that RSN defaulted on its loans on August 31, 2001, and that on September 28, 2001, Taylor, as an unlimited guarantor, paid the remaining principal and interest due on the RSN loans, thereby resulting in no balance being "currently due" and "payable" to The Bank.
It is clear according to the plain language of the Striplin pledge agreement that Striplin's liability under the agreement could arise no sooner than one year after the date of RSN's default, i.e., September 31, 2002. Striplin's liability under the pledge agreement was extinguished on September 28, 2001, the date Taylor tendered to The Bank the remaining balance due and payable on the RSN loans. Furthermore, the language of the Striplin pledge agreement specifically dictates that Striplin owned the certificate of deposit because it provided that The Bank could "charge against" the certificate of deposit only any balance "currently" remaining. Thus, Taylor's reading of the condition of Striplin's liability under the Striplin pledge agreement so narrowly as to ignore the necessity for a balance due and payable on the loans after the expiration of the one-year period following RSN's default is inconsistent with the unambiguous terms of the pledge agreement.
The intent of the parties corroborates our reading of the Striplin pledge agreement, even if we were to conclude that it was ambiguous. Both The Bank and Striplin confirmed that the pledge of the certificate of deposit was intended as a "last-out" pledge. Striplin testified as follows:
 "Q. [Attorney for Taylor:] . . . It's your position that this pledge was a last-out pledge; is that correct?
 "A. Absolutely. That's the way Jimmy [Taylor, Sr.,] had offered it, and that's the way I accepted it."
Jimmy Taylor, Sr., the chairman and chief executive officer of The Bank, testified as follows:
 "Q. [Attorney for Striplin:] Let me ask you this way. Just tell me what your understanding was about the pledge that Mr. Striplin was going to execute?
 "A. He was going to pledge that on the note, and that the other collateral was going to come before his note. And if the other collateral did not cover all the indebtedness, [Striplin's] [certificate of deposit] could come into play. But if it did, his [certificate of deposit] would be released.
 "Q. Is that what you mean by last out?
 "A. Yes.
 ". . . .
 "Q. I think you've already testified it was your understanding when the loan was paid off, that released Mr. Striplin from his pledge?
 "A. That was my understanding. That once it was paid off, [Striplin] would be released. Same as last out. If that's last out, he would be released.
 "Q. Because as last out, he would only be called on if the collateral and the guarantors failed to pay the loan off?
 "A. Yes sir."
(Emphasis added.)
As noted previously, Taylor was legally subrogated to all the rights and remedies accorded The Bank under § 8-3-2, Ala. Code 1975. However, once Striplin's liability to The Bank under the Striplin pledge agreement was extinguished, The Bank had no further right to enforce any charges against the certificate of deposit. Accordingly, Taylor, as subrogee, has no right to charge any amount against the certificate of deposit. *Page 304 
Because our decision in this case turns on the construction of the Striplin pledge agreement itself, we do not reach the trial court's alternative holding as to lack of consideration. Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.
SEE, LYONS, STUART, BOLIN, and MURDOCK, JJ., concur.
COBB, C.J., recuses herself.
[1] The Bank has filed a brief in this case as amicus curiae.
[2] We note that the following individuals are also limited guarantors of the loans but are not parties to this action: Terry DeWitt, Gary Andridge, Leon Ashford, Ron Ezell, William Fitzpatrick, Frank Lee, Jan Noojin, Scott Powell, Alan Pizzitola, Kirk Wood, Jr., Lloyd Wood, and Leah O. Taylor. Although these limited guarantors are not named parties in this action, Taylor, in his motion for a summary judgment, claims to be representing the interests of Ashford, Powell, Noojin, Fitzpatrick, Lee, and Leah Taylor, as the "paying guarantors."
[3] In November 2000, Striplin redeemed certificate of deposit no. 31369 in the amount of $1 million and used the proceeds to obtain another certificate of deposit, no. 32392, in the amount of $815,821.48.